## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**CASE NO.:** 17-cv-60041-O'Sullivan

[Consent Case]

HENRY AVILA,

                Plaintiff,

v.

CWC TRANSPORTATION, LLC,
CARLOS ASSAYAG,
CLEMENTE E. CRUZ,
WILLIAM MASARO,

                Defendants.

_____/

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, Henry Avila, by and through the undersigned counsel, pursuant to Fed. R. Civ. P. 56 and L.R. 56.1, hereby files this motion seeking judgment as a matter of law that Plaintiff is not exempt from the Fair Labor Standards Act ("FLSA"), 29 U.S.C § 201 *et seq.*, under the Motor Carrier Exemption, 29 U.S.C. § 213(b)(1) ("MCE"), and in support, Plaintiff states the following:

### I.   Introduction

On January 9, 2017, Plaintiff filed suit against Defendants for unpaid overtime wages.[1] As more fully explained herein, Plaintiff is not exempt because (1) the fuel delivered to Port Everglades cannot be sold in the form that it arrives and must be processed and materially altered

---

[1] On January 15, 2017, two tanker truck drivers filed suit against Defendants pursuant to the FLSA in *Pallares et al v. CWC Transportation, LLC et al*, Case No. 17-60098. As of the filing of Plaintiffs' Second Amended Complaint [DE 45] in *Pallares*, eighteen additional plaintiffs have joined that action asserting similar claims. That case presents similar claims as this case. *Pallares* is currently pending before the Honorable William J. Zloch, United States District Judge. Dispositive motions in that case have been filed.

at Port Everglades before being loaded onto Defendants' tanker trucks, and (2) the shipper's fixed and persistent intent in the fuel ends when it comes to rest at the large storage tanks at Port Everglades terminal.

Accordingly, Plaintiff's transportation of gasoline locally is not part of a continuity of movement in interstate commerce. Plaintiff is not exempt from overtime as a matter of law and Plaintiff's Motion for Summary Judgment should be GRANTED.

## II. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial burden of establishing that no genuine issues of material fact remain. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). "If the non-moving party fails to show a genuine issue exists, summary judgment should be granted." *Herman v. City of St. Petersburg*, 131 F. Supp. 2d 1329 (M.D. Fla. 2001) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)).

## III. The Fair Labor Standards Act

The FLSA was enacted in 1938 to ensure that every employee receives "a fair day's pay for a fair day's work." *A.H. Phillips v. Walling*, 324 U.S. 490, 493 (1945) (quoting address to Congress by Franklin D. Roosevelt in 1937). In light of the FLSA's ***broad remedial purposes***, it is well settled that the FLSA is to be ***liberally construed*** to apply to the furthest reaches consistent with congressional direction. *See Biggs v. Wilson*, 1 F.3d 1537 (9th Cir. 1993). The FLSA requires that employees be paid minimum wage for their work, and that employees who work more than forty hours per week receive overtime compensation at the rate of "time and a half" for every hour over forty. 29 U.S.C. § 207(a)(1) and (e); 29 C.F.R. § 778.108. Employers who violate the overtime

provisions of the FLSA "shall be liable to the employee or employees affected in the amount of…their unpaid overtime compensation…and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b)

## IV. The Motor Carrier Exemption

Section 213(b)(1) of the FLSA provides an exemption from the overtime provisions of the FLSA for "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49."

"Exemptions from the overtime provisions of section 207 are to be narrowly construed against the employer. The Act should be interpreted liberally in the employee's favor. The defendant must prove applicability of an exemption by 'clear and affirmative evidence.'" *Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 805 (11th Cir. 1992) (internal citations omitted).

"There are two requirements for an employee to be subject to the motor carrier exemption." *Walters v. American Coach Lines, Inc.*, 575 F.3d 1221, 1227 (11th Cir.2009). "First, his employer's business must be subject to the Secretary of Transportation's jurisdiction under the MCA." *Id.* "Second, the employee's business-related activities must directly affect the safety of operation of motor vehicles in the transportation on the public highways of passengers or property *in interstate or foreign commerce* within the meaning of the Motor Carrier Act." *Id.* (citations omitted) (emphasis added); *accord* 29 C.F.R. § 782.2(a).

The parties agree that Plaintiffs' activities took place entirely within the state of Florida. However, the motor carrier exemption can still apply because even "purely intrastate transportation can constitute part of interstate commerce if it is part of a '**continuous stream of interstate travel**.' For this to be the case, there must be a '**practical continuity of movement**' between the intrastate segment and the overall interstate flow." *Walters v. Am.Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1229 (11th Cir. 2009)(citations omitted). **A "critical factor in determining the shipment's essential character is the shipper's 'fixed and persistent intent' at the time of the shipment."** *Mena v. McArthur Dairy, LLC*, 2009 WL 3004009 (11th Cir. 2009) (citing 29 C.F.R. § 782.7 (b)(2)). **"Whether the shipper has the requisite intent to move goods in interstate commerce depends on the totality of the facts and circumstances of each case."** *Central Freight Lines v. I.C.C.*, 899 F.2d 413, 419-20 (5th Cir. 1990) (quoting *Texas v. United States*, 866 F.2d 1546, 1556 (5th Cir. 1989)). **"The nature of a shipment is ... determined ... by the essential character of the commerce, reflected by the intention formed prior to shipment, pursuant to which the property is carried to a selected destination by a continuous or unified movement."** *Bilyou v. Dutchess Beer Distributors. Inc.*, 300 F.3d 217, 223 (2d Cir. 2002) (quoting *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 672 (1th Cir. 1993)). *See also Atlantic Coast Line R. Co. V. Standard Oil of Kentucky*, 275 U.S. 257, 269, 48 S.Ct. 10, 72 L.Ed. 270 (1927)(**determining continuity of transportation by examining whether the destination of the goods "is arranged for or fixed in the minds of the sellers."**); *Kitzek v. Steiner Corp.*, 110 F.3d 1465, 1469 (9th Cir. 1997) (**"Whether transportation is interstate of intrastate is determined by the essential character of the commerce,** *manifested by shipper's fixed and persisting transportation intent at the time of the shipment.*"**) (emphasis in the original); 29 C.F.R. § 782.7(b)(2)(**intrastate transportation can satisfy the interstate commerce requirement of the MCA if the shipper has a "fixed and persisting transportation intent beyond the terminal storage point at the time of shipment."**)

*4 The Eleventh Circuit is in favor of a "general consideration that draws a fixed and persisting intent 'from all of the facts and circumstances surrounding the transportation.' " *Mena*, 2009 WL 3004009 at *4.

*Romero v. Fueltech Oil Serv. Corp.*, 09-21948-CIV, 2010 WL 11505519, at *3–4 (S.D. Fla. Apr. 5, 2010) (emphasis added).

4

**1. Intrastate Processing or Altering of a Product Terminates Prior Interstate Continuity of Movement and Disqualifies the MCE**

In *Arkadelphia Milling Co. v. St. Louis Southwestern Railway Co.*, 249 U.S. 134 (1919), the Supreme Court held that the movement of lumber from the woods to a mill, where it was made into staves, headings and hoops, was not movement in interstate commerce because "it was not intended that [the lumber] be transported out of the state, or elsewhere beyond the mill, until it had been subjected to a manufacturing process that materially changed its character, utility, and value." *Id.* at 150–51.

The Eighth Circuit case of *Roberts v. Levine*, 921 F.2d 804, 807, 816 (8th Cir.1990) applied *Arkadelphia Milling* to conclude that the transportation of soybeans to a plant that processed them into soybean meal and soybean oil was not movement in interstate commerce because the processing resulted in "the creation of an article of commerce, as distinct from the packing, bailing and the like of an existing one." (internal quotes omitted). In *Mena*, the Eleventh Circuit cited *Roberts*: "*Cf. Roberts,* 921 F.2d at 816 (finding that the fixed and persisting intent test was not satisfied where shipper did not intend for the interstate shipment of raw soybeans, but rather expected them to be processed intrastate into a new commodity, one that had been materially changed in character, utility, and value before leaving the state) (citation omitted)." *Mena* at 307. (Internal quotations omitted.)

In *Pritchett v. Werner Enterprises, Inc.*, CIV.A. 12-0182-WS-C, 2013 WL 6909892, at *4 (S.D. Ala. Dec. 31, 2013), jumbo rolls of paper were transported from a base mill where the paper rolls were produced to a sheeter facility where the paper was cut into reams of paper before being transported out of state. The court held that transportation from the base mill to the sheeter facility did not constitute part of a continuous stream with interstate travel and, therefore, the plaintiffs

were not exempt under the MCE. The court observed that, while jumbo rolls could be technically considered paper, they were not a usable end product until cutting them into reams transformed them into sheets of copy paper thereby changing their "character, utility and value:"

> The defendant notes that, once they leave the base mill, the jumbo rolls undergo no chemical processing and have no raw materials added. The defendant identifies Boise's product as "paper" and insists that the jumbo rolls constitute paper just as much as the finished reams.

*Id.* at *4.

> That the transformation to copy paper materially changes the "character, utility and value" of a jumbo roll is evident. A jumbo roll is not a usable end product but an intermediate product created in the midst of a process designed to produce individual sheets of copy paper.

*Id.* at *5.

When Eleventh Circuit authority has held that the motor carrier exemption applies to a plaintiff's solely intrastate movement of materials, courts repeatedly emphasize that ***no processing or other material change occurred during transit***. In *Galbreath v. Gulf Oil Corp.*, 413 F.2d 941 (5th Cir. 1969), the court emphasized that no comingling, processing, or alteration of the petroleum product occurred during transit:

> The transported products are the **identical products** tendered to and shipped via Colonial Pipeline Company lines from Gulf's refineries; there is **no commingling of product in transit**. Gulf withdraws at the Chattahooche Terminal the same Gulf products tendered at the refinery for shipment through Colonial's pipelines. […] With the exception of a de-icer added to Gulf A-1 Jet Fuel delivered to one customer served by Gulf's Atlanta Bulk Plant, **no processing or alteration of the transported products occurs** at the Chattahoochee Terminal **or at any location after the product leaves the refinery, <u>nor does the introduction of additives occur at any time after the products leave the refinery</u>**.

6

*Id.* at 943. Emphasis added. *See also Mena v. McArthur Dairy, LLC*, 352 F. App'x 303, 307 (11th Cir. 2009) ("[t]he property was pre-packaged and not modified once it reached [Defendant's] warehouse."); *Shew v. Southland Corp. (Cabell's Dairy Div.)*, 370 F.2d 376, 378 (5th Cir. 1966) (driver's movement intrastate of butter, oleo, and whipping cream involved "no alteration or processing of these products"); *Narbona v. Gold Coast Beverage Distributors, Inc.*, 1:13-CV-24148-UU, 2014 WL 11906594, at *6 (S.D. Fla. July 15, 2014) ("[Defendant] never altered or modified the product"); *Aira v. Best Nat. Vending, Inc.*, 19 Wage & Hour Cas. 2d (BNA) 1333 (S.D. Fla. 2012) (prepackaged vending machine products such as chips, candy and soda that plaintiffs moved intrastate were not modified or altered after arriving in state); *Castillo v. Lara's Trucking Inc.*, 2017 Wage & Hour Cas. 2d (BNA) 43141 (S.D. Fla. 2017) (the plaintiffs' intrastate movement of goods remained "in the same boxes and pallets in which they were shipped"); *Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 182 (11th Cir. 1991) (armored truck drivers transported unaltered checks and other financial instruments bound for outside Florida).

### 2. Gasoline is Processed and Altered at Port Everglades Terminating Prior Interstate Continuity of Movement and Disqualifying the MCE.

Pursuant to the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, with few exceptions,[2] all gasoline sold to the ultimate consumer and to retail gas stations in the United States must contain detergents to prevent the accumulation of deposits in engines and fuel supply systems:

> Detergents. Effective beginning January 1, 1995, no person may sell or dispense to an ultimate consumer in the United States, and no refiner or marketer may directly or indirectly sell or dispense to persons who sell or dispense to ultimate consumers in the United States any gasoline which does not contain additives to prevent the accumulation of deposits in engines or fuel supply systems.

---

[2] Only (1) gasoline used in research, development, and testing, (2) racing and aviation fuel, and (3) gasoline that is sold or process in California are exempt from containing detergents. 40 C.F.R. § 80.160.

7

42 U.S.C.A. § 7545(l).

Acceptable fuel detergents must meet specific performance requirements to minimize accumulation of deposits.[3] These detergents modify the gasoline by decreasing exhaust emissions and improving vehicle fuel economy, handling, drivability, longevity, and the time between vehicle repairs and maintenance.[4] Unless gasoline contains detergents that meet specific additive certification requirements, the gasoline cannot be sold to consumers or retail gas stations.[5] The unique formulas of fuel detergents are usually protected by patents.[6]

Gasoline that does not contain detergents is known as "base gasoline."[7] Base gasoline cannot be sold to the general public and must be labeled, "Not for sale to the ultimate consumer."[8]

All gasoline delivered to Port Everglades is base gasoline[9] and, by federal law, cannot be sold to the general public or retail gas stations in the form that it arrives.[10] Fuel detergents, ethanol,

---

[3] *See* 40 CFR 80.165 - Certification test procedures and standards.

[4] "The effective control of deposits in gasoline engine and fuel supply systems has been shown to reduce the emission of nitrogen oxides, hydrocarbons, and carbon monoxide in engine exhaust, while enhancing fuel economy. Accordingly, the intent of the detergent certification program is to help achieve the primary public health and environmental protection goals of the Clean Air Act." (61 FR 35310, Friday, July 5, 1996) "Recognizing that deposits in gasoline engines and fuel supply systems can increase harmful exhaust emissions and adversely affect vehicle fuel economy and driveability, Congress specified in section 211(l) of the Clean Air Act…" *Id.* at 35312. Statement of Material Facts at ¶¶ 21-23.

[5] 40 CFR 80.161(b) - Detergent additive certification requirements; 42 U.S.C.A. § 7545(l).

[6] *See, e.g.*, *Ferox, LLC v. ConSeal Int'l, Inc.*, 175 F. Supp. 3d 1363, 1365 (S.D. Fla. 2016).

[7] Definitions, 40 C.F.R. § 80.140. Statement of Material Facts at ¶ 10.

[8] "If the product being transferred is base gasoline, then in addition to the base gasoline identification, the following warning must be stated on the PTD: 'Not for sale to the ultimate consumer'. If, pursuant to § 80.160(a), the product being transferred is exempt base gasoline to be used for research, development, or test purposes only, the following warning must also be stated on the PTD: 'For use in research, development, and test programs only.'" 40 C.F.R. § 80.158(a)(5). Statement of Material Facts at ¶ 11.

[9] Statement of Material Facts at ¶ 9.

[10] 42 U.S.C.A. § 7545(l). Statement of Material Facts at ¶ 11.

and other additives are added to the gasoline at Port Everglades at the time that the gasoline is loaded into the tanker trucks operated by Plaintiff.[11]

Different brand gasolines are defined by what fuel detergents, ethanol, and other additives are added to the base gasoline at Port Everglades' various terminals.[12] Unbranded gasoline also has fuel detergents, ethanol, and other additives added to the base gasoline at Port Everglades' various terminals.[13]

While base gasoline is interchangeable for purposes of making branded and unbranded gasoline, the modified branded and unbranded gasolines are not interchangeable.[14] After the base gasoline, fuel detergent, ethanol, and other additives are mixed to create a branded or unbranded gasoline, the new product cannot be sold under a different brand name.[15] Florida law prohibits the sale of branded gasoline under any other brand name.[16] Similarly, Florida law prohibits the sale of branded gasoline that has been mixed with different gasoline.[17]

As previously discussed, the base gasoline delivered to Port Everglades has no fuel detergents and cannot be sold to the general public or retail gas stations.[18] Only after the base gasoline is properly mixed with ethanol, fuel detergents, and other additives does the gasoline become a product sellable to the general public and retail gas stations.[19] The production of branded and unbranded gasoline at Port Everglades terminals creates new sellable products that terminate

---

[11] Statement of Material Facts at ¶¶ 9, 13, 15, 25, 26, 27, 30, 31.
[12] Statement of Material Facts at ¶ 14.
[13] Statement of Material Facts at ¶¶ 13, 15, 25, 26.
[14] Statement of Material Facts at ¶ 32.
[15] Statement of Material Facts at ¶ 33.
[16] Fla. Stat. § 526.04. Statement of Material Facts at ¶¶ 32-34.
[17] Fla. Stat. § 526.05. Statement of Material Facts at ¶¶ 32-34.
[18] Statement of Material Facts at ¶¶ 32-34.
[19] Statement of Material Facts at ¶ 11.

the prior interstate movement.[20] "[T]he creation of an article of commerce, as distinct from the packing, bailing and the like of an existing one, will generally be a terminus of transportation[.]" *Baltimore & O.R. Co. v. United States*, 15 F. Supp. 674, 676 (N.D.N.Y. 1936).

Like the lumber in *Arkadelphia Milling*, in the present case the base gasoline was not intended to be transported beyond the Port Everglades storage terminals "until it had been subjected to a manufacturing process that materially changed its character, utility, and value." *Id.* at 151.

Like the soybeans in *Roberts*, the mixing of base gasoline with ethanol, fuel detergents, and other additives at Port Everglades results in "the creation of an article of commerce, as distinct from the packaging, bailing and the like of an existing one." *Id.* at 816. As previously discussed, the Clean Air Act prohibits the sale of base gasoline delivered to Port Everglades until it undergoes further processing that transforms the base gasoline into one of an array of non-interchangeable branded and unbranded products specifically ordered by fuel marketers for sale at retail gas stations.

Like the transformation of jumbo rolls of paper into reams of paper in *Pritchett*, the base gasoline's transformation into various sellable branded and unbranded gasolines at Port Everglades "materially changes the character, utility and value" of the base gasoline. Like the jumbo rolls, base gasoline is "not a usable end product but an intermediate product". *Id.* at *5. While the jumbo rolls of paper were merely cut into reams of paper, in the present case the base gasoline is transformed into different brands and unbranded fuel that perform differently and can then be legally sold.

---

[20] Statement of Material Facts at ¶¶ 12-14.

### 3. The *Shipper's* Fixed and Persistent Intent

In cases where goods being transported locally by plaintiff-drivers are not bound for interstate destinations, such as when goods are brought in from out of state and then distributed from a warehouse within the state to end destinations in that state, such goods are not part of a continuous movement in interstate commerce unless **the shipper** has "fixed and persisting transportation intent beyond the terminal storage point at the time of shipment." *DeMaria v. Ryan P. Relocator Co.*, 512 F. Supp. 2d 1249, 1255 (S.D. Fla. 2007). Pursuant to 29 C.F.R. § 782.7(b), if the **shipper** has no fixed and persisting transportation intent beyond the terminal storage point **at the time of shipment**, the motor carrier exemption does not apply:

> The Interstate Commerce Commission held that transportation confined to points in a single State from a storage terminal of commodities which have had a prior movement by rail, pipeline, motor, or water from an origin in a different State is not in interstate or foreign commerce within the meaning of part II of the Interstate Commerce Act **if the shipper has no fixed and persisting transportation intent beyond the terminal storage point at the time of shipment**. See Ex parte No. MC-48 (71 M.C.C. 17, 29). The Commission specifically ruled that there is not fixed and persisting intent where: (i) At the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond the terminal storage, and (ii) the terminal storage is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated, and (iii) transportation in the furtherance of this distribution within the single State is specifically arranged only after sale or allocation from storage.

29 C.F.R. § 782.7(b)(2) (emphasis added).

In *Romero v. Fueltech Oil Serv. Corp.*, 09-21948-CIV, 2010 WL 11505519 (S.D. Fla. Apr. 5, 2010), the court held that drivers delivering gasoline from Port Everglades to local businesses, including retail gas stations, were not exempt under the MCE. The court's analysis was as follows:

11

The law clearly provides that the shipper's intent is key in determining if the motor carrier exemption applies. Accordingly, the Court must begin by identifying the "shipper." In this matter, **the fuel supplier and the defendant distributors are distinct entities**. Both Transmontaigne and Targa Liquids ship fuel from outside the state into Florida. **Transmontaigne delivers its fuel to storage tanks at Port Everglades**, while Targa delivers its fuel to Florigas' facility. Transmontaigne and Targa bring the fuel into Florida from out of state. It is only when the fuel comes to rest in Florida, do the Defendants take over. **Accordingly, the Court finds Transmontaigne and Targa are the shippers.**

The question thus becomes what was Transmontaigne and Targa's **intent at the time the fuel left their out of state facitilies** [sic]. Did they intend for the fuel to continue on past Fueltec and Florigas to the end customers, or did they simply intend for the fuel to make it into Florida?

Based on the facts presented, the Court simply cannot conclude that the shippers had a fixed and persistent intent for the fuel to continue past the storage point. Although Fueltec and Florigas had specific orders from their various customers, these orders were not with the shipper. Indeed, the record reflects that the shippers only have arrangements with Fueltec and Florigas. Unlike some of the other cases presented, **the shipper has no connection to the ultimate consumer. The shippers do not have contracts with the gas stations, restaurants and others who purchase fuel from Defendants.** *Compare Walters*, 575 F.3d at 1224 (Cruise passengers paid shipper cruise line directly for use of distributor shuttle service); *Billings v. Rolling Frito-Lay Sales, LP*, 413 F.Supp.2d 817 (S.D. Tex. 2006)(shipper owned the distribution center). Indeed, because Defendants compensate the shippers regardless of who purchases the fuel after it is loaded into the storage tanks, it is clear that the shippers' interest in the fuel ends when it lands in Florida. Accordingly, the Court finds the shippers' intent was only to get the fuel into Florida, but not to continue on as a separate leg of interstate commerce. As a result, Defendants' intrastate distribution of the fuel simply does not meet the interstate commerce requirement.

*Romero v. Fueltech Oil Serv. Corp.*, 09-21948-CIV, 2010 WL 11505519, at *4 (S.D. Fla. Apr. 5, 2010) (emphasis added).

In the present case, analysis of the shippers' intent is the same as in *Romero*. First, the identity of the shippers in this case is the same as the identity of the shippers in *Romero*: the refining companies; e.g., Marathon, Shell, Exxon, Valero, etc.

Second, the intent of the refining companies should be analyzed ***at the time the fuel was leaving their out-of-state facilities***. Like *Romero*, in the present case the shippers (i.e., refining companies) only have arrangements with CWC and petroleum marketers such as Sunshine Gasoline Distributors, Inc. ("Sunshine")—not retail gas stations. Like *Romero*, in the present case the shippers have no connection with the retail gas stations. Like *Romero*, in the present case the shippers do not have contracts with the gas stations; instead, the gas stations have contracts with fuel marketers such as Sunshine. Like *Romero*, in the present case the shippers' interest in the fuel ends when it lands in Florida.

In addition to the analysis in *Romero*, as previously discussed *supra* at pp. 7-10, the fuel shipped to Port Everglades terminals is base gasoline and cannot legally be sold to either retail gas stations or the general public without further processing. Fuel additives (such as ethanol, detergents, and other additives) that are tailored depending on the specific brand of gasoline ordered, are blended with the base gasoline to create the branded or unbranded gasoline ordered at the time the gasoline is loaded from the terminal storage tanks into CWC's tanker trucks.

Accordingly, the shippers' intent—at the time the fuel was leaving their out-of-state facilities—was only to get the fuel into Florida, but not to continue on as a separate leg of interstate commerce.

Defendants in this case are contracted by different fuel marketers to transport branded and unbranded gasoline from terminals at Port Everglades to different retail gas stations.[21] The shippers are the various refining companies delivering base gasoline to Port Everglades.[22] Defendants do not work for the shipper.[23] Defendants are not owned by the shipper.[24] Defendants do not make deliveries on behalf of the shipper.[25] Nor is there any evidence that any retail gas stations, fuel marketers, or Defendants take ownership of the goods until after they come to rest at the storage terminals when they are loaded into the tanker trucks.

There is no evidence that the shippers have any "fixed and persisting transportation intent beyond [their] terminal storage point[s] at the time of shipment[s]." *See* 29 C.F.R. § 782.7(b)(2). In this case, the terminal storage points are the large storage tanks at Port Everglades, from which CWC and other gasoline transportation companies load fuel into their own tanker trucks.

At the time the base gasoline is delivered to Port Everglades, neither the product nor the customer is defined.[26] Only after a branded or unbranded gasoline is ordered by a petroleum marketer is the gasoline then produced before being loaded into a CWC truck.[27] There is no evidence that the shippers have any knowledge, control, or concern as to where the goods will ultimately be delivered by Plaintiff. Thus, Defendants cannot establish the requisite fixed and persisting transportation intent on the part of the shippers necessary to meet Defendants' burden

---

[21] Statement of Material Facts at ¶¶ 38-44, 46-48.
[22] *Romero* at *4. Statement of Material Facts at ¶ 45.
[23] Statement of Material Facts at ¶¶ 43-44.
[24] Statement of Material Facts at ¶ 47.
[25] Statement of Material Facts at ¶¶ 43-44, 46-47.
[26] Statement of Material Facts at ¶ 42.
[27] Statement of Material Facts at ¶¶ 25-31, 46.

of proving that the goods carried by Plaintiff in this case are done in interstate commerce for purposes of the Motor Carrier Act.

In the 1927 U.S. Supreme Court case of *Atlantic Coast Line R. Co. v. Standard Oil Co.*,[28] the plaintiff, Standard Oil, maintained large petroleum storage facilities at Port Tampa, Tampa and Jacksonville. 275 U.S. 257, 267 (1927). Standard Oil would order its products from out-of-state refineries, with title to these products not passing to Standard Oil until they were delivered to its in-state storage facilities. *Id.* at 262-263. Standard Oil would then arrange for the products to be distributed intrastate. *Id.* Approximately 95% of the fuel oil sold by Standard Oil in Florida was in contracts made before the oil had been shipped from out of state to Standard Oil's storage facilities. Based on these facts, the U.S. Supreme Court held that:

> ***the interstate or foreign commerce in all this oil ends upon its delivery to the plaintiff into the storage tanks or the storage tanks at the seaboard***, and that from there its distribution to storage tanks, tank cars, bulk stations, and drivein [sic] stations, or directly by tank wagons to customers, is all intrastate commerce. This distribution is the whole business of the plaintiff in Florida. ***There is no destination intended and arranged for with the ship carriers in Florida at any point beyond the deliveries from the vessels to the storage tanks or tank cars of the plaintiff***. There is no designation of any particular oil for any particular place within Florida beyond the storage receptacles or storage tank cars into which the oil is first delivered by the ships. ***The title to the oil in bulk passes to the plaintiff as it is thus delivered.*** When the oil reaches these storage places along the Florida seaboard, it is within the control and ownership of the plaintiff for use for its particular purpose in Florida. ***The plaintiff is free to distribute the oil according to the demands of its business***, and it arranges its storage capacity to meet the future variation in its business needs....

> [...]

---

[28] Although this is not a Motor Carrier Act Exemption case, its analysis of the movement of petroleum goods in interstate commerce is instructive and has been utilized by other courts in determining the application of the Exemption. *See, e.g., Collins v. Heritage Wine Cellars, Ltd.*, 589 F.3d 895 (7th Cir. 2009).

The seaboard storage stations are the natural places for a change from interstate and foreign transportation to that which is intrastate and there is nothing in the history of the whole transaction which makes them otherwise, either in intent or in fact. ***There is nothing to indicate that the destination of the oil is arranged for or fixed in the minds of the sellers beyond the primary seaboard storages of the plaintiff company****…*. everything that is done after the oil is deposited in the storage tanks…is done in the distribution of the oil to serve the purposes of the plaintiff company that imported it. ***Neither the sellers, who deliver the oil, nor the railroad company, that aids the delivery of the oil to the storage tanks and tank cars at the seaboard, has anything to do with determining what the ultimate destination of the oil is, or has any interest in it, or any duty to discharge in respect to it****…*.

This same principle was reiterated in the more recent 2009 Motor Carrier Act Exemption case of *Collins v. Heritage Wine Cellars, Ltd.* In that case, the Seventh Circuit Court held that there was evidence of a "fixed and persisting intent" by the defendant that goods remain in interstate commerce throughout the final intrastate leg of the journey where the defendant, an Illinois wholesale importer and local distributor of wine, owned and controlled the wine and directed its movements from the moment of shipment to the moment the goods reached their intrastate customers. 589 F.3d 895 (7th Cir. 2009). However, had the defendant "shipped its wine to a wholesale distributor in a Chicago suburb, title passed to the distributor when the wine arrived at the distributor's warehouse, and the distributor contracted to sell the wine to retail stores and delivered it to them in their own trucks," then "the carriage of the wine from the warehouse to the stores would be classified as ***an intrastate shipment*** under the Motor Carrier Act even though the property shipped originated outside the state." *Id*. at 897 (citing, e.g., *Atlantic Coast Line R. Co. v. Standard Oil Co*., 275 U.S. 257 (1927)). Emphasis Added.

The factual circumstances in *Atlantic Coast Line R. Co.*, as well as those contemplated in dicta by the Seventh Circuit in *Collins*, are nearly identical to the circumstances in this case. Fuel marketers, such as Sunshine, buy branded and unbranded fuel from refining companies at Port

16

Everglades, with title to the fuel not passing to Sunshine until the fuel is produced, paid for, and loaded into CWC's tanker trucks from the refining companies' storage tanks. In fact, the only significant difference between the local fuel marketers in this case and the fuel distributor in *Atlantic Coast Line* is that the fuel marketers do not order their fuel directly from out of state refineries, but rather purchases the fuel on a daily as-needed basis at Port Everglades.[29] This fact, alone, sufficiently illustrates that the fuel marketers and CWC play no role in the products' interstate journey from the out of state refineries to the refining companies' intrastate storage tanks.

Finally, the Defendants and fuel marketers are "free to distribute the oil according to the demands of [their] business" and there is nothing in the record which suggests that the refining companies have "anything to do with determining what the ultimate destination of the [products]" will be, or "has any interest in [them], or any duty to discharge in respect to [them]." *Atlantic Coast Line R. Co.*, 275 U.S. at 270; *see also Higgins v. Carr Bros. Co.*, 317 U.S. 572 (1943) (holding that, when merchandise coming from without the state was unloaded at grocery wholesaler's place of business, **interstate movement ended** where, from that point onward, wholesaler owned all of its merchandise, made its own deliveries, and made no sales on commission on order with shipments direct from the out of state dealer or producer to the retail customer). Although it is anticipated that Defendants will point to cases that have held that the shipper need not know the exact ultimate destination of the goods in order to intend that the goods move continuously in interstate commerce (*see, e.g., Int'l. Brotherhood of Teamsters v. I.C.C.*, 921 F.2d 904 (9th Cir. 1990)), these cases are **irrelevant** in situations such as this one, which involve two separate

---

[29] Statement of Material Facts at ¶ 46.

shippers, one to the terminals (subject to the Secretary of Transportation's interstate authority) and one from the terminals (purely intrastate), so that the out-of-state shipper is not the person who determines the final destination of the goods. *Central Freight Lines v. I.C.C.*, 899 F.2d 413 (5th Cir. 1990); *see also Texas v. U.S.*, 866 F.2d 1546 (5th Cir. 1989).

Accordingly, like the interstate movement of goods in *Atlantic Coast Line R. Co.*, ***the interstate movement of goods in this case ends upon arrival at Port Everglades terminals***. Any subsequent delivery of these goods by Plaintiff to fuel marketers' customers is purely intrastate movement and there is no "practical continuity of movement between the intrastate segment and the overall interstate flow." *Mena*, No. 09-12657, 2009 WL 3004009 at *3. Thus, the Motor Carrier Act Exemption does not apply.

## V. Conclusion

For the foregoing reasons, Plaintiff is not exempt from the FLSA under the MCE as a matter of law. Plaintiff's Motion for Summary Judgment should be GRANTED.

Respectfully submitted,

Koz Law, P.A.
320 S.E. 9th Street
Fort Lauderdale, Florida 33316
Phone: (786) 924-9929
Fax:    (786) 358-6071
Email: ekoz@kozlawfirm.com

_____
Elliot Kozolchyk, Esq.
Bar No.: 74791

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed on October 16, 2017 with the Clerk of Court using CM/ECF along with having served all counsel of record or pro se parties identified on the service list incorporated herein in the manner specified, either via transmission of Electronic filing generated by CM/ECF or in some other authorized manner for those counsel or parties not authorized to receive electronically Notice of Electronic Filing.

Respectfully submitted,

_____
Elliot Kozolchyk, Esq.

## SERVICE LIST

Randy M. Goldberg, Esq.
*Counsel for Defendants*
Randy M. Goldberg & Associates, P.A.
1101 SW 71st Ave
Plantation, FL 33317
Tel: (754) 224-0867
E-mail: rmgesq@comcast.net, randymgoldberg@gmail.com

19