UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 17-60041-CIV-O'SULLIVAN

[CONSENT]

HENRY AVILA,

      Plaintiff,

v.

CWC TRANSPORTATION, LLC, et al.,

      Defendants.

_____/

## ORDER

THIS MATTER is before the Court on the Plaintiff's Motion for Partial Summary

Judgment (DE# 46, 10/16/17) and the Defendants' Motion for Summary Judgment with

Incorporated Memorandum of Law (DE# 48, 10/17/17).

## BACKGROUND

The plaintiff filed a single-count complaint seeking recovery of unpaid overtime

wages and liquidated damages pursuant to the Fair Labor Standards Act, 29 U.S.C. §§

201 et seq. (hereinafter "FLSA"). See Complaint under 29 U.S.C. 201 - 216 for Violation

of the Fair Labor Standards Act ("FLSA") (DE# 1, 1/9/17) (hereinafter "Complaint").

The parties have filed cross-motions for summary judgment on whether the

Motor Carrier exemption bars the plaintiff's overtime claim. The plaintiff filed his motion

for summary judgment on October 16, 2017. See Plaintiff's Motion for Partial Summary

Judgment (DE# 46, 10/16/17) (hereinafter "Plaintiff's Motion"). The defendants filed

their response on November 5, 2017. See Defendants' Response to Plaintiff's Motion

for Partial Summary Judgment with Incorporated Memorandum of Law (DE# 51,

11/5/17) (hereinafter "Defendants' Response"). The plaintiff filed his reply on November 13, 2017. See Plaintiff's Reply in Support of Plaintiff's Motion for Partial Summary Judgment (DE# 56, 11/13/17) (hereinafter "Plaintiff's Reply").

The defendants filed their motion for summary judgment on October 17, 2017. See Defendants' Motion for Summary Judgment with Incorporated Memorandum of Law (DE# 48, 10/17/17) (hereinafter "Defendants' Motion"). The plaintiff filed his response on November 6, 2017. See Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (DE# 53, 11/6/17) (hereinafter "Plaintiff's Response"). The defendants filed their reply on November 13, 2017. See Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment (DE# 55, 11/13/17) (hereinafter "Defendants' Reply").

The parties also filed statements of undisputed fact. See Plaintiff's Statement of Material Facts (DE# 45, 10/16/17) (hereinafter "Plaintiff's SOF"); Defendants' Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment (DE# 48-2, 10/17/17) (hereinafter "Defendants' SOF"); Defendants' Second Statement of Undisputed Material Facts in Support of Its Response to Plaintiff's Motion for Summary Judgment (DE# 51-1, 11/5/17) (hereinafter "Defendants' RSOF"); Plaintiff's Response to Defendants' Statement of Material Facts (DE# 52, 11/6/17) (hereinafter "Plaintiff's RSOF").

The plaintiff notes that the defendant failed to comply with Local Rule 56.1(a) which provides that:

> Statements of material facts submitted in opposition to a motion for summary judgment shall correspond with the order and with the paragraph numbering scheme used by the movant . . . . Additional facts

2

which the party opposing summary judgment contends are material shall
be numbered and placed at the end of the opposing party's statement of
material facts; the movant shall use that numbering scheme if those
additional facts are addressed in the reply.

S.D. Fla. L. R. 56.1(a).

The Court agrees with the plaintiff that the defendants failed to comply with Local

Rule 56.1(a). The defendants failed to respond to the facts enumerated in the plaintiff's

SOF choosing instead to file Defendants' Second Statement of Undisputed Material

Facts in Support of Its Response to Plaintiff's Motion for Summary Judgment (DE# 51-

1, 11/5/17).

The remedy for failing to adhere to Local Rule 56.1(a) is contained in subsection

(b) which states that:

All material facts set forth in the movant's statement filed and supported
as required above will be deemed admitted unless controverted by the
opposing party's statement, provided that the Court finds that the
movant's statement is supported by evidence in the record

S.D. Fla. L. R. 56.1(b). The Court finds that even applying Local Rule 56.1(b) against

the defendants, genuine issues of material fact preclude summary judgment for either

party for the reasons discussed below.

## **FACTS**[1]

## 1.    **Petroleum Products at Port Everglades**

There are no oil refineries in Florida. See Affidavit of Carlos Assayag (DE# 48-1

at n.2, 10/17/17). The petroleum products stored at the fuel storage terminals in Port

Everglades, Florida come from outside the state. Defendants' SOF at ¶ 17.

---

[1] The Court will summarize only those facts which are relevant to the Court's
adjudication of the instant motions.

The gasoline delivered to Port Everglades is "base gasoline." Plaintiff's SOF at ¶ 9. Base gasoline cannot be sold to the general public. Plaintiff's SOF at ¶ 11. Fuel detergents, ethanol and other fuel additives must be added to base gasoline before it can be sold. Plaintiff's SOF at ¶ 10.[2]

Numerous refining companies (Marathon, Shell, Exxon, Valero, etc.) own and operate fuel storage terminals at Port Everglades. Plaintiff's SOF at ¶ 37. "Gasolines sold at Port Everglades include 'branded gasoline' such as Marathon, Citgo, Shell, Valero, Chevron, ExxonMobil, and Sunoco, and 'unbranded gasoline,' which is not marketed under a specific trade name." Plaintiff's SOF at ¶ 12. "Both branded and unbranded gasolines have fuel detergents, ethanol, and other additives added to them" and the different brands of gasoline are determined by what additives are added to the base gasoline. Plaintiff's SOF at ¶¶ 13-14. Fuel detergents impact performance by "preventing the accumulation of carbon deposits in vehicles' engines and fuel systems," "greatly improve the vehicle's fuel economy, handling, drivability, longevity, and the time between vehicle repairs and maintenance" and "reduce the vehicle's emissions." Plaintiff's SOF at ¶¶ 21-23.

All gasoline transported by the defendants' trucks have fuel detergents added and more than 99.5 percent of the gasoline transported by the defendants has ethanol added to it. Plaintiff's SOF at ¶¶ 15-16. Diesel and "Rec-90" gasoline have no ethanol. Plaintiff's SOF at ¶ 19. The parties dispute whether Diesel and "Rec-90" have fuel detergents and other additives. See Plaintiff's SOF at ¶ 20; Defendants' RSOF at ¶ 9.

---

[2] As discussed below, the defendants maintain that the petroleum products delivered to Port Everglades are in their final form. See Defendants' RSOF at ¶ 5.

4

The parties dispute whether petroleum products are mixed with other ingredients while at Port Everglades. The defendants state that "[t]he petroleum products once received at Port Everglades, Florida are in their final form and not subject to any further processing or refinement while at Port Everglades." Defendants' RSOF at ¶ 5.[3] The plaintiff states that base gasoline is transformed into branded and unbranded gasoline at Port Everglades by "mixing base gasoline, ethanol, fuel detergents, and other additives." Plaintiff's SOF at ¶25. According to the plaintiff, this process occurs before the petroleum product is loaded into the defendants' trucks. Plaintiff's SOF at ¶¶ 26-27. The defendants' truck drivers make no changes to the petroleum products. Defendants' RSOF at ¶¶ 7-8, 10.

Gasoline prices fluctuate daily and with respect to unbranded gasoline orders, the defendants determine which fuel storage terminal to use that day based on the lowest price. Plaintiff's SOF at ¶¶ 35-36.

The defendants provide their drivers with computer tablets containing gasoline orders. Plaintiff's SOF at ¶28. The tablets inform the drivers which fuel storage terminal to go to and whether branded and unbranded gasoline has been ordered. Plaintiff's SOF at ¶29. The drivers enter the order information into a computer kiosk at the fuel

---

[3] The defendants also state that:

Any additives that may have been added to some of the Suppliers' petroleum products, was done by the Suppliers, at their facilities, to the Suppliers own products, before the Defendants' driver(s)/Plaintiff(s), took control of the petroleum products, which occurs when the Supplier loaded the petroleum products into the Defendants' tanker trucks at the Suppliers' terminals.

Defendants' RSOF at ¶ 6.

storage terminal and "[t]he computer system then mixes and loads into the truck the precise quantities of base gasoline, fuel detergent, ethanol, and other additives that create the brand of gasoline ordered." Plaintiff's SOF at ¶¶ 30-31.[4]

The parties dispute whether the refining companies know the identity of the buyers at the time base gasoline is delivered to fuel storage terminals in Port Everglades or whether the refining companies deliver base gasoline to fulfill specific orders of branded and unbranded gasoline.[5] The parties also dispute whether the refining companies contract with the defendant to transport petroleum products from Port Everglades to retail gas stations and who pays the defendants for this service.[6]

---

[4] Again, the defendants insist that the fuel products at Port Everglades are "in their final form." Defendants' RSOF at ¶ 5.

[5] See Plaintiff's SOF at ¶¶ 42, 45 ("When base gasoline is delivered to storage terminals at Port Everglades, it is not yet known or determined which jobber will purchase that gasoline, what kind of branded or unbranded gasoline it will become, or which retail gas stations it will be delivered to" and "Refining companies do not deliver base gasoline to Port Everglades terminals to fulfill specific orders of branded or unbranded gasoline by jobbers"); Defendants' SOF at ¶¶ 3-4 ("The delivery of petroleum products by the Plaintiff(s) [sic] who are employee truck drivers for CWC is based upon Bills of Lading which are created by the Suppliers . . . based upon standing orders, created from the ratable volume determined by the various supply agreements, historical performance and sales with the Suppliers' end-user gas stations" and "The Suppliers know the ultimate destinations of their shipments as the Suppliers' shipments to their fuel terminals in Port Everglades, is based upon standing orders from Suppliers' ratable volume of fuel which is based on various supply agreements, historical performance and sales with the end-user gas stations as determined by the petroleum Suppliers.").

[6] See Plaintiff's SOF at ¶¶ 43-44 ("CWC is contracted and paid by jobbers, such as Sunshine Gasoline Distributors, Inc., to transport fuel from Port Everglades terminal to retail gas stations" and "CWC is not paid by the refining companies to transport fuel from Port Everglades terminal to retail gas stations." ); Affidavit of Carlos Assayag (DE# 48-1 at ¶¶ 5C, 28 (attesting that "CWC's drivers, the Plaintiffs herein, **pursuant to contractual relationships with the Suppliers and/or their Fuel Distributor & Marketing Agreements** retrieves the petroleum products from the Suppliers' terminal

The refining companies do not own or operate the retail gas stations. Plaintiff's SOF at ¶ 37. The refining companies do not sell petroleum products directly to retail gas stations. Plaintiff's SOF at ¶38. The refining companies sell to "jobbers." Plaintiff's SOF at ¶39. "A jobber is a petroleum marketer that acts as a 'middleman' between the refining companies and the retail gasoline stations." Plaintiff's SOF at ¶40. "Jobbers sell gasoline to retail gas stations which, in turn, sell gasoline to the ultimate consumer." Plaintiff's SOF at ¶41. Defendant CWC is not a subsidiary of any refining company. Plaintiff's SOF at ¶¶ 47-48.[7]

## 2.    The Plaintiff

The plaintiff was a full time employee of the defendants. Defendants' SOF at ¶ 1; Defendants' Motion at 2. The defendants meet the definition of a "Motor Private Carrier" or "Motor Carrier" under 49 U.S.C. § 13102. Defendants' SOF at ¶ 14.

The plaintiff's primary duty was the delivery of petroleum products for the Defendants and included "safety affecting activities" within the meaning of the Motor Carrier Act of 1935, as amended. Defendants' SOF at ¶¶ 11-12. As part of his job requirements, the plaintiff held a Commercial Driver's license. Id. at ¶¶ 2-3. The plaintiff drove tanker trucks provided by the defendants which weighed in excess of 10,000 pounds. Id. at ¶¶ 6-7.

To effectuate his duties, the plaintiff drove fuel tanker trucks to fuel storage

---

at Port Everglades . . ." and that "[t]he Supplier is ultimate[ly] responsible for all transportation charges relating to the Defendants.") (emphasis added).

[7] The plaintiff also states that "CWC is not a for-hire motor carrier for any refining company." Plaintiff's SOF at ¶ 48. The defendants state "Defendants are common carriers of the Suppliers." Defendants' RSOF at ¶ 12.

terminals located in Port Everglades. Defendants' SOF at ¶ 5. The plaintiff would pick up petroleum products from fuel storage terminals in Port Everglades and transport those products to retail gas stations in Florida. Id.

Each delivery of petroleum products by the plaintiff for the defendants was accompanied by a Bill of Lading. Defendants' SOF at ¶ 9. "Title to the petroleum products remain[ed] with the Supplier at all times until the petroleum products [were] delivered to the Suppliers' retail end-user customers, when the title transfer[ed] to the end-user."  Defendants' RSOF at ¶ 11.[8]

## STANDARD OF REVIEW

The Court, in reviewing a motion for summary judgment, is guided by the standard set forth in Federal Rule of Civil Procedure 56(a), which states as follows:

> A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).

The moving party bears the burden of meeting this exacting standard. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  That is, "[t]he moving party bears 'the initial responsibility of informing the . . . [C]ourt of the basis for its motion, and identifying those portions of the "pleadings, depositions, answers to interrogatories, and

---

[8] The plaintiff maintains that the gasoline is purchased by the jobbers. See Plaintiff's SOF at ¶ 42 ("When base gasoline is delivered to storage terminals at Port Everglades, it is not yet known or determined which jobber will purchase that gasoline . . . .").

admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.'" U.S. v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting Celotex, 477 U.S. at 323). In assessing whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising therefrom in the light most favorable to the non-moving party. Batey v. Stone, 24 F.3d 1330, 1333 (11th Cir. 1994).  "When evaluating cross-motions for summary judgment, the Court analyzes each individual motion on its own merits and thus views the facts on each motion in the light most favorable to the respective nonmovant." Adega v. State Farm Fire & Cas. Ins. Co., No 07-20696, 2009 WL 3387689, at *3 (S.D. Fla. Oct. 16, 2009). Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain. Id. If the record presents factual issues, the Court must deny the motion and proceed to trial. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

Despite these presumptions in favor of the non-moving party, the Court must be mindful of the purpose of Rule 56 which is to eliminate the needless delay and expense to the parties and to the Court occasioned by an unnecessary trial. Celotex, 477 U.S. at 322-23. Consequently, the non-moving party cannot merely rest upon his bare assertions, conclusory allegations, surmises or conjectures. Id. As the Supreme Court noted in Celotex:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against the party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Id. at 322-323.  Thus, the mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient. There must be evidence on which the jury could reasonably find for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).

## ANALYSIS

The sole issue on summary judgment is whether the Motor Carrier exemption bars the plaintiff's overtime claim. An employer seeking exemption from the overtime pay requirements of the FLSA has the burden of affirmatively showing that each of the essential conditions to an exemption are met. See Brock v. Norman's Country Market, Inc., 835 F.2d 823, 827 (11th Cir. 1988) (citing Foremost Dairies, Inc. v. Wirtz, 381 F.2d 653 (5th Cir. 1967)).[9] The FLSA is to be interpreted liberally. See Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1315 n. 36 (11th Cir. 2011) (recognizing that courts "liberally construe the FLSA's terms to ensure that coverage extends 'to the furthest reaches consistent with congressional direction.'") (quoting Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 296 (1985)). As such, exemptions to the FLSA are narrowly construed against the employer. Alvarez Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1156 (11th Cir. 2008).

As explained below, genuine issues of material fact preclude the entry of summary judgment on the Motor Carrier exemption for either party.

---

[9] In Bonner v. City of Prichard, 661 F. 2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

1.     **Allegations in the Plaintiff's Complaint Do Not Entitle the Defendants to Summary Judgment**

At the outset, the defendants state that the plaintiff is precluded from arguing that the parties were not engaged in interstate commerce for purposes of the Motor Carrier exemption because the plaintiff pled in his Complaint[10] that "the Plaintiff worked as a truck driver delivering petroleum products for the Defendants and that the **Defendants 'engaged along with its employees in interstate commerce.'"** Defendants' Response at 1 (emphasis added). The defendants urge the Court to "find that the Plaintiff's representation in his Complaint that he engaged in interstate commerce be considered as a proper admission." Id. 1-2.

The Court is not persuaded by the defendants' argument. In the instant case, it is undisputed that the plaintiff transported petroleum products only in Florida. "For purposes of the [M]otor [C]arrier exemption to the FLSA's overtime compensation requirement, '[t]ransportation within a single State is in interstate commerce within the meaning of the [FLSA] **where it forms a part of a "practical continuity of movement" across State lines from the point of origin to the point of destination**.'" Billingslea v. S. Freight, Inc., 699 F. Supp. 2d 1369, 1375 n.9 (N.D. Ga. 2010) (quoting 29 C.F.R. § 782.7(b)(1) and Walling v. Jacksonville Paper Co., 317 U.S. 564, 568-69 (1943) (emphasis added)). There are no allegations in the Complaint from which the Court can conclude that the plaintiff's deliveries were part of "a 'practical

---

[10] In addition to the Complaint, the defendants also refer to "representations and acknowledgments" made by the plaintiff in "the Joint Stipulation of Facts" and "through the discovery process." Defendants' Motion at 18-19. For the reasons stated herein, the Court is not persuaded by the defendants' argument.

continuity of movement'" between states. Accordingly, the Court finds that the manner in which the plaintiff pled his Complaint does not preclude him from arguing that the Motor Carrier exemption is inapplicable in the instant case.

**2.     The Motor Carrier Exemption**

The Motor Carrier exemption is found in Section 213(b)(1) of the FLSA and provides that the FLSA's overtime provision, section 207, does not apply "to any employee with respect to whom the Secretary of Transportation has the power to establish qualifications and maximum hours of service pursuant to the provisions of Section 31502 of Title 49." Alvarado v. I.G.W.T. Delivery Systems, Inc., 410 F.Supp. 2d 1272 (S.D. Fla. 2006) (quoting 29 U.S.C. § 213(b)(1)).

The Eleventh Circuit has explained that "[t]he Secretary has the power to establish qualifications and maximum hours of service for employees who (1) are employed by carriers whose transportation of passengers or property by motor vehicle is subject to the Secretary's jurisdiction under the Motor Carrier Act; and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." Baez v. Wells Fargo Armored Service Corp., 938 F.2d 180, 181-82 (11th Cir. 1991) (citing 29 C.F.R. § 782.2(a)).

The parties do not dispute the first prong, that the defendants are carriers who are subject to the jurisdiction of the Secretary of the Department of Transportation. See Defendants' SOF at ¶ 14 (stating that "[t]he defendants meet the definition of a "Motor Private Carrier" or "Motor Carrier" under 49 U.S.C. § 13102."); Plaintiff's RSOF at ¶ 14;

Plaintiff's Response at 2 (stating "Plaintiff does not dispute that his work for Defendants affected the safety of operation of motor vehicles, but disagrees that his work was in interstate commerce.").

At issue is the second prong. Specifically, whether the plaintiff's intrastate deliveries of petroleum product constituted interstate commerce under the Motor Carrier exemption. The Court will address this prong below.

    **a.    Interstate Continuity of Movement**

The parties do not dispute that the plaintiff transported petroleum products exclusively within the state of Florida. As noted above, "purely intrastate transportation can constitute part of interstate commerce if it is part of a 'continuous stream of interstate travel.'" Walters v. Am. Coach Lines of Miami, Inc., 575 F.3d 1221, 1229 (11th Cir. 2009) (per curiam) (quoting Chao v. First Class Coach Co., Inc., 214 F. Supp. 2d. 1263, 1272 (M.D. Fla. 2001)). The Eleventh Circuit has stated that "there must be a 'practical continuity of movement' between the intrastate segment and the overall interstate flow." Mena v. McArthur Dairy, LLC, 352 F. App'x 303, 306 (11th Cir. 2009) (quoting Walters, 575 F.3d at 1229). Additionally, "[a] critical factor in determining the shipment's essential character is the shipper's 'fixed and persisting intent' at the time of the shipment." Id. (quoting 29 C.F.R. § 782.7(b)(2)).

The defendants cite to Galbreath v. Gulf Oil Corp., 413 F.2d 941 (5th Cir. 1969), noting that "[t]he Galbreath Court emphasized in its holding that 'no processing or other material change occurred during transit by a third party transporting company, ("Colonial Pipeline Company") who facilitated transporting the products to another

terminal."  Defendants' Response at 3-4 (footnote omitted). The defendants reason that "[ j]ust like in the case at bar, once the petroleum products are loaded by the Suppliers into the Defendants' tanker trucks, no changes were made to the petroleum products and no additives are added **by the Defendants or Plaintiff**." Id. at 4 (emphasis added).

The Court finds that Galbreath is distinguishable from the instant case. In footnote 3 in Galbreath, the Fifth Circuit stated that the "Plaintiffs have not made an issue over this small amount of processing and neither do we. The adding of the de-icer to an insignificant amount of the total gallonage at the Atlanta Bulk Plant has no effect on the continuity of movement in interstate commerce." Galbreath, 413 F.2d at 943, n.3. Unlike the plaintiff in Galbreath, the plaintiff in the instant action argues that the introduction of additives to the base gasoline at Port Everglades is significant and terminates the prior interstate continuity of movement of the fuel and the transportation of the petroleum products from Port Everglades to retail gas stations in Florida is purely intrastate. See Plaintiff's Motion at 18 (stating that "the interstate movement of goods in this case ends upon arrival at Port Everglades terminals.") (emphasis omitted).

Specifically, the plaintiff notes that the petroleum products delivered to Port Everglades are "base gasoline" which must be altered before it can be sold:

> All gasoline delivered to Port Everglades is base gasoline and, by federal law, cannot be sold to the general public or retail gas stations in the form that it arrives. Fuel detergents, ethanol, and other additives are added to the gasoline at Port Everglades at the time that the gasoline is loaded into the tanker trucks operated by Plaintiff.

Plaintiff's Motion at 8-9 (footnote omitted). Additionally, the plaintiff notes that at Port Everglades the petroleum products are transformed into branded and unbranded

gasoline:

> Different brand gasolines are defined by what fuel detergents, ethanol, and other additives are added to the base gasoline at Port Everglades' various terminals. Unbranded gasoline also has fuel detergents, ethanol, and other additives added to the base gasoline at Port Everglades' various terminals.
>
> While base gasoline is interchangeable for purposes of making branded and unbranded gasoline, the modified branded and unbranded gasolines are not interchangeable. After the base gasoline, fuel detergent, ethanol, and other additives are mixed to create a branded or unbranded gasoline, the new product cannot be sold under a different brand name. Florida law prohibits the sale of branded gasoline under any other brand name. Similarly, Florida law prohibits the sale of branded gasoline that has been mixed with different gasoline.

Id. at 9 (footnotes omitted). The plaintiff therefore argues that: "[t]he production of branded and unbranded gasoline at Port Everglades terminals creates new sellable products that terminate the prior interstate movement." Id. at 9-10.

The defendants dispute these facts. The defendants maintain that the petroleum products delivered to Port Everglades are in their final form. See Defendants' RSOF at ¶ 5; see also Defendants' Response at 3; Defendants' Motion at 17 (stating that "the petroleum products were not modified when they were at the Suppliers' fuel terminals at Port Everglades.").[11] The defendants further note that "[c]ertain petroleum products like diesel fuel or Rec-90 are not subject to any additives." Id. The plaintiff contests this

---

[11] The defendants also state that:

> Any additives that may have been added to some of the Suppliers' other petroleum products, was done by the Suppliers, at their facilities, to their own products, before the Defendants' driver (the Plaintiff), took control of the petroleum products, when the Supplier loaded the petroleum products into the Defendants' tanker trucks at the Suppliers' terminals.

Defendants' Response at 3.

representation, stating that ethanol-free products like diesel and Rec-90 "still have fuel

detergents and other additives added to them." Plaintiff's Reply at 10 (footnotes

omitted). The plaintiff further notes that ethanol-free products constitute "[l]ess than half

of one percent (<0.5%) of gasolines loaded into CWC trucks at Port Everglades . . . ."

Id. (footnotes omitted).

     Genuine issues of material fact preclude summary judgment for either party. As

summarized above, the parties dispute whether the petroleum products at Port

Everglades were in their final form. Based on the disputed record, the Court cannot

determine as a matter of law whether the plaintiff's delivery of petroleum products to

retail gas stations was "part of a 'continuous stream of interstate travel.'" Walters, 575

F.3d at 1229.

     The defendants also argue that the instant case is "absolutely analogous" to

Mena v. McArthur Dairy, LLC, 352 F. App'x 303, 306 (11th Cir. 2009) (per curiam).

Defendants' Motion at 19.

     In Mena, the Eleventh Circuit concluded that the plaintiff "transported property in

interstate commerce" because:

> Uncontroverted testimony establishe[d] that much of the property that [the
> plaintiff] transported previously had been manufactured in other states by
> [the defendant]'s parent company and delivered to [the defendant]'s Miami
> warehouse. Because [the defendant] delivered dairy and other
> refrigerated products to customers, the property transported was
> perishable and usually of a reasonably short shelf-life. The property was
> pre-packaged and not modified once it reached [the defendant]'s
> warehouse. Cf. Roberts, 921 F.2d at 816 (finding that the fixed and
> persisting intent test was not satisfied where shipper did not intend for the
> interstate shipment of raw soybeans, but rather expected them to be
> processed intrastate into "a new commodity, one that had been materially
> changed in 'character, utility, and value' " before leaving the state) (citation
> omitted). From there the products were distributed to [the defendant]'s

customers based on standing orders and customers' projected needs, as calculated by customers' past purchases. Under these circumstances, [the defendant]'s warehouse was nothing more than a temporary storage hub used to facilitate the orderly distribution of products through interstate commerce. Additionally, some deliveries, such as those by [the plaintiff] to Sky Chefs, a company that then sold those products to airlines for passenger consumption on domestic and international flights, were bound for destinations outside of Florida. Thus, [the plaintiff]'s transportation of these products was part of the "practical continuity of movement" across state lines. See Walters, 575 F.3d at 1221 (holding that intrastate shuttle service for cruise passengers from an airport to a seaport was part of the practical continuity of movement of interstate travel).

Id. at 307 (footnote omitted).

The Court finds that Mena is distinguishable from the instant case. Defendant CWC is not a subsidiary of the refining companies. The fuel storage terminals at Port Everglades are owned an operated by the refining companies and not by the defendants. The parties dispute whether the petroleum products are modified at Port Everglades. The parties also dispute whether the refining companies know the identity of the buyers of the petroleum products at the time base gasoline is delivered to fuel storage terminals in Port Everglades or whether the refining companies deliver base gasoline to fulfill specific orders of branded and unbranded gasoline. Lastly, all of the petroleum products transported by the defendants were bound for retail gas stations located within the state. Thus, the Court cannot conclude that the defendants are entitled to summary judgment based on the holding in Mena.

**b.     The Shipper's Intent**

As noted above, the Eleventh Circuit has stated that "[a] critical factor in determining the shipment's essential character is the shipper's 'fixed and persisting intent' **at the time of the shipment**." Mena, 352 F. App'x at 306 (quoting 29 C.F.R. §

782.7(b)(2)) (emphasis added).

The plaintiff maintains that "the shippers' intent—at the time the fuel was leaving their out-of-state facilities—was only to get the fuel into Florida, but not to continue on as a separate leg of interstate commerce." Plaintiff's Motion at 13. The plaintiff notes that:

> when base gasoline is delivered to storage terminals at Port Everglades, it is not yet known or determined which fuel marketer will purchase that gasoline, what kind of branded or unbranded gasoline it will become, or which retail gas stations it will be delivered to. Refining companies do not deliver base gasoline to Port Everglades terminals to fulfill specific orders of branded or unbranded gasoline by jobbers. Therefore, the shippers cannot have a fixed and persistent intent for the base gasoline beyond the storage terminals at Port Everglades, at the time the shipment is shipped, when the finished branded or unbranded gasoline has not yet been produced or ordered, and neither the fuel marketer, carrier, nor gasoline station have been determined.

Plaintiff's Reply at 8 (footnotes omitted). The plaintiff further states that:

> There is no evidence that the shippers have any knowledge, control, or concern as to where the goods will ultimately be delivered by Plaintiff. Thus, Defendants cannot establish the requisite fixed and persisting transportation intent on the part of the shippers necessary to meet Defendants' burden of proving that the goods carried by Plaintiff in this case are done in interstate commerce for purposes of the MCE

Plaintiff's Response at 6.

The defendants argue that "the Suppliers' intent from the time the petroleum products [were] refined at the Suppliers' refineries, shipped interstate to Port Everglades, where the Plaintiff driver delivered the petroleum products to the Suppliers' end-user retail gas stations, was to engage in interstate commerce." Defendants' Response at 6. The defendants note that they:

> do not sell or broker the sale of petroleum products to anyone, they are a common carrier whose sole purpose is the transportation of petroleum

18

products from the Suppliers' fuel terminals at Port Everglades to the Suppliers' end-user retail customers, which is supported by a Bill of Lading that is created for each delivery, based on historical sales, standing orders and end-user usage by the Suppliers' retail gas stations (SOF ¶¶ 9 & 10; AFF. ¶¶ 25, 26; 2d SOF ¶¶ 3,4)[.] At no time did the Plaintiff/driver transport petroleum products from the Suppliers' fuel terminals to third party facility or facilities owned or controlled by the Defendants; all deliveries were made directly from the Suppliers terminals to the end-user retail gas station as reflected on the Bills of Lading. (2d SOF ¶¶ 3,15.) Further, title to the petroleum products is held by the Suppliers until the Plaintiff delivers the petroleum products to the retail end-user. (2d SOF ¶¶ 12.)

Id. at 7 (footnote omitted). The plaintiff states that "[c]ontrary to Defendants' claim, the refining companies' customers are fuel marketers and not retail gas stations." Plaintiff's Reply at 9 (footnote omitted). The plaintiff further notes that "Defendants are hired and paid by the fuel marketers—not the refining companies—to transport fuel from Port Everglades terminal to retail gas stations." and that "Defendants fill orders for fuel marketers on a daily, as needed basis " Id. (footnotes omitted).

In the instant case, the Court is precluded from determining "the shipper's 'fixed and persisting intent' at the time of the shipment," Mena, 352 F. App'x at 306, because several critical factors are disputed by the parties. The parties dispute whether the refining companies know the identity of the buyers of the petroleum products at the time base gasoline is delivered to fuel storage terminals in Port Everglades or whether the refining companies deliver base gasoline to fulfill specific orders of branded and unbranded gasoline. The parties also dispute who owns the petroleum products at the time they are transported by the defendant to the retail gas stations. The defendants maintain that title to the petroleum products remain with the Supplier. See Defendants' RSOF at ¶ 11. The plaintiff maintains that the jobbers purchase the gasoline. See

Plaintiff's SOF at ¶ 42 ("When base gasoline is delivered to storage terminals at Port Everglades, it is not yet known or determined which jobber will purchase that gasoline . . . ."). Based on this disputed record, the Court cannot ascertain the shipper's intent as a matter of law.

      **c.    The Department of Transportation Factors**

The defendants ask the Court to apply the factors employed by the Department of Transportation "for determining the 'fixed and persisting intent' of a shipper (i.e. the Suppliers) that merchandise continue in interstate commerce when moving goods intrastate from storage facilities." Defendants' Motion at 15; Defendants' Response at 8. The defendants summarize these factors as follows:

> (i) The Suppliers know the ultimate destinations of their shipments . . . in that the Suppliers' shipment to the end-user is based upon standing orders from Suppliers' ratable volume of fuel which is based on various supply agreements, historical performance and sales with the end-user gas stations as determined by the Suppliers. (2d SOF ¶¶ 3,4; AFF. ¶ 28.) (ii) There is no processing or substantial product modification that takes place at Port Everglades by the Defendants; any additives that may have been added by the Suppliers does not materially alter or change the character of the petroleum products. (SOF ¶ 17; [ ]2d SOF ¶¶ 5,6.) The petroleum products are subject to de minimus "storage in transit" at Port Everglades, until the products are loaded into the Defendants' tankers and the Plaintiff delivers them to the retail locations, in accordance with the Bills of Lading. (2d SOF ¶¶ 3,13; AFF. ¶ 28; SOF ¶¶ 5, 9.) (iii) The petroleum products while at Port Everglades are maintained at the fuel terminals owned, controlled and operated by the Suppliers and documented and tracked by the Suppliers. Id. (iv) The Suppliers are ultimately responsible for all transportation charges relating to the Defendants. Id.

Defendants' Response at 8 (footnote omitted). The first, second and fourth factors are disputed by the parties as already noted in this Order. Accordingly, even if the Court were to employ the Department of Transportation Factors, they are not of particular

20

help in ascertaining the shippers' intent given the disputed record.

### d.   Department of Labor Opinion Letter

The defendants also cite an opinion letter by the U.S. Department of Labor DOL-FLSA 2005-10 (hereinafter "DOL Opinion Letter").  See Defendants' Response at 9. The parties are in agreement that the Court should apply Skidmore[12] to the DOL opinion letter. See Plaintiff's Response at 12; Defendants' Reply at 7 (stating that "the DOL's interpretation is entitled, at least, to Skidmore deference to the extent the Court finds the interpretations, rulings, and opinion letters persuasive.").

The Court notes that some of the factors relied on in the DOL Opinion Letter are disputed in the instant case. For instance, one of the factors is that "[n]o processing or substantial product modification of substance occurs at the warehouse or distribution center. . . . ." DOL Opinion Letter at 2. This factor is disputed in the instant case.

Based on the disputed record, the Court will not grant summary judgment for either party on this issue.

## CONCLUSION

Having reviewed the applicable filings, the evidence in the record and the law,

---

[12] In Skidmore v. Swift & Co., the Supreme Court noted that:

rulings, interpretations and opinions of the [agency], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

323 U.S. 134, 140 (1944).

the Court finds that genuine issues of material fact exist as to whether the Motor Carrier

exemption bars the plaintiff's overtime claim under the FLSA. Accordingly, it is

ORDERED AND ADJUDGED that the Plaintiff's Motion for Summary Judgment

(DE# 46, 10/16/17) and the Defendants' Motion for Summary Judgment with

Incorporated Memorandum of Law (DE# 48, 10/71/17) are **DENIED**.

DONE AND ORDERED in Chambers, Miami, Florida, this **26th** day of January,

2018.

_____

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies to:
All Counsel of Record

22